**ADAMS, RAY & ROSENBERG, a partnership, et al., Plaintiffs,**

**v.**

**WILLIAM MORRIS AGENCY, INC., a California Corporation, et al., Defendants.**

**Civ. No. 75–1883–HP.**

United States District Court, C. D. California.

March 24, 1976.

Hill, Farrer & Burrill by Stanley E. Tobin, David C. Grant, Los Angeles, Cal., for plaintiffs.

Kaplan, Livingston, Goodwin, Berkowitz & Selvin by Bayard F. Berman, William T. Rintala, Beverly Hills, Cal., Covington & Burling by Henry P. Sailer, Washington, D. C., for defendant William Morris Agency, Inc.

Selvin & Weiner by Paul P. Selvin, Los Angeles, Cal., for defendant Writers Guild of America, West, Inc.

Hanna & Morton by Michael C. Mitchell, Los Angeles, Cal., for defendant Artists' Managers Guild.

## ORDER DENYING DEFENDANT WILLIAM MORRIS' MOTION FOR PRELIMINARY INJUNCTION

PREGERSON, District Judge.

This is a declaratory judgment action seeking to determine whether the Writers Guild of America/Artists' Manager Basic Agreement of 1975 (the "Basic Agreement"), as enforced by a Writers' Guild of America work rule, is valid under the federal antitrust laws. The Basic Agreement governs the terms under which an artists' manager may represent a member of the Writers Guild of America (the "Guild"), an association of motion picture and television writers.

Plaintiffs, duly licensed artists' managers under California Labor Code §§ 1700.5 *et seq.*, signed the Basic Agreement after prolonged negotiations with the Guild, but William Morris Agency, Inc. ("Morris"), also a licensed artists' manager, refused to sign. The Guild's internal work rule[1] prohibits its members from entering into agreements of representation with artists' managers who have not signed the Basic Agreement. Because Morris refused to sign the Basic Agreement, it is precluded from entering into new representation contracts with Guild members by the operation of the work rule.

Morris, in refusing to sign the Basic Agreement, specifically expressed resistance to provision 9 which limits receipt of "package commissions."[2] The term

---

1. The Guild's work rule 23 states: "No writer shall enter into a representation agreement, whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients."

2. Provision 9 of the Basic Agreement provides in part:

 9. *Packaging*

 (c) Except as hereafter provided, no package commission shall be permitted to any Artists'

"package" generally refers to all or part of the basic elements needed to produce a television program or series. The creator of a package is called the "package owner." A member of the Guild can, of course, be a package owner. A package is usually sold or licensed to a major studio or network for production and exhibition. In developing and selling a package, the owner may use the services of a packaging agent who receives a contingent package commission based on a percentage of the selling or licensing price, usually 10%.

Provision 9 of the Basic Agreement governs the receipt of package commissions as follows:

A packaging agent *can* accept a package commission if:

(1) The package owner is not a member of the Guild and the package commission was agreed to before any Guild member was employed to work on the package; or

(2) The package owner is not a member of the Guild and any Guild members employed to work on the package were represented by an artists' manager other than the packaging agent.

A packaging agent *cannot* accept a package commission if:

(1) The package owner is not a member of the Guild, and Guild members represented by the packaging agent were employed to work on the package before its sale or license; or

(2) The package owner is a member of the Guild.

A significant amount of Morris' income has stemmed from package commissions. If Morris signs the Basic Agreement, its receipt of package commissions will be limited by provision 9, but if Morris does not sign, it will be precluded from representing Guild members by the Guild's internal work rule.

On May 15, 1975, an organization called the Artists' Managers Guild, of which Morris is a member, sent a letter to plaintiffs stating that a tentative draft of provision 9 of the Basic Agreement raised serious antitrust questions which would lead to litigation "if that agreement [were] implemented." In response to this threatened litigation, plaintiffs filed the instant action, and since the Writers Guild refused to be named as co-plaintiff, it was joined as a defendant. Morris cross-claimed as to Writers Guild and counterclaimed as to plaintiffs for a concerted refusal to deal and a group boycott in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

■ This cause is now before the court upon Morris' motion, filed December 10, 1975, to enjoin this alleged concerted refusal to deal and group boycott. Morris' motion for preliminary injunction raises the issue whether provision 9 of the Basic Agreement, as enforced by the Guild's work rule, is immune from the federal antitrust laws by reason of the labor exemption. This labor exemption is comprised of a *statutory exemption* and a *non-statutory exemption*.

■ Sections 6 and 20 of the Clayton Act (15 U.S.C. § 17 and 29 U.S.C. § 52)

Manager who represents a writer or his materials in connection with a package.

(d) An Artists' Manager who represents a writer in connection with the writer's services or materials related to or in connection with a package may receive a package commission only in the following circumstances:

(i) Where the Artists' Manager has obtained his right to a package commission from a third party or parties before any writer was employed or rendered services in connection with the package; and

(ii) The writer entitled to separation of rights, if any, and/or the writer who has writ-

ten the pilot which is in fact produced or used as the basis for the sale of the package, is not a client of the Artists' Manager who receives the package commission; and

(iii) The Artists' Manager who receives a package commission does not give to or share with the Artists' Manager who represents the writer who is entitled to a separation of rights or who has written the pilot any consideration or commission relating to the package in any form.

and the Norris-LaGuardia Act (29 U.S.C. §§ 101–115) are the basic sources of the *statutorily* created labor exemption from the antitrust laws. These Acts strictly limit the jurisdiction of federal courts to issue injunctions in labor-related disputes. The pertinent provisions of the Clayton Act are:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . organizations, instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17.

> No restraining order or injunction shall be granted by any court of the United States . . . in any case . . . involving, or growing out of, *a dispute concerning terms or conditions of employment* . . . .

29 U.S.C. § 52 (emphasis added).

The pertinent provisions of the Norris-LaGuardia Act are:

> No court of the United States . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a *labor dispute*
>
> . . . . .

29 U.S.C. § 101 (emphasis added).

> The term "labor dispute" includes any *controversy concerning terms or conditions of employment*, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c) (emphasis added).

These sections of the Clayton and Norris-LaGuardia Acts limit this court's jurisdiction to issue the requested preliminary injunction if the present controversy is a "labor dispute" within the meaning of 29 U.S.C. §§ 101 and 113(c), which term includes a "dispute concerning terms or conditions of employment" within the meaning of 29 U.S.C. § 52.

■ In *United States v. Hutcheson,* the court construed the jurisdictional limitation contained in § 20 of the Clayton Act (29 U.S.C. § 52):

> So long as a union acts in its self-interest and does not combine with nonlabor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.
>
> 312 U.S. 219, at 232, 61 S.Ct. 463 at 466, 85 L.Ed. 788 at 793 (footnote omitted).

*Hutcheson* then established a two pronged test for determining if a controversy is a "dispute concerning terms or conditions of employment," as that phrase is used in § 20 of the Clayton Act: (1) a union must not combine with a "nonlabor group"; and (2) a union's action must be in its "self-interest." If these requirements are met, the dispute is within the statutory exemption created by the Clayton and Norris-LaGuardia Acts, and a party to such a dispute is immune from liability under the antitrust laws even if its actions impose restraints on competition in the relevant product market.

■ If a union, however, does combine with a nonlabor group, thereby precluding the application of the *statutory* exemption, the union's activities may still be exempt under the judicially created *nonstatutory* exemption to the federal antitrust laws. *Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975)—the leading case on the statutory/nonstatutory dichotomy—discussed the creation

and limits of this nonstatutory exemption:

> The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy [which is the source of the nonstatutory exemption] requires tolerance for the lessening of business competition based on differences in wages and working conditions. (citations omitted). Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some [direct] restraints [on competition among employers] by acting unilaterally, e. g., *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market.

421 U.S. at 622–23, 95 S.Ct. at 1835, 44 L.Ed.2d at 426.

 To prevail on its motion for preliminary injunction, Morris must show a reasonable probability of proving (1) that provision 9 of the Basic Agreement, as enforced by the Guild's work rule, is not within the statutory *or* nonstatutory labor exemptions to the antitrust laws, and (2) that the implementation of the Basic Agreement would violate federal antitrust laws.

The court will now consider whether the labor exemption—statutory or nonstatutory—is applicable to the present controversy. First the statutory exemption. As discussed above, *Hutcheson* established that the activities of a labor organization come within the statutory exemption to the federal antitrust laws if the union has not combined with a "nonlabor group" and if the union's action is in its "self-interest."

The first prong of the *Hutcheson* test is met if the Guild has not acted in combination with a nonlabor group. Morris concedes for purposes of this motion that plaintiffs and the Guild have not entered into an unlawful conspiracy. The only ground for finding a labor-nonlabor combination would be the mere existence of the Basic Agreement between plaintiffs and the Guild. No injunctive relief is presently sought against plaintiffs because the alleged writers' boycott is solely the result of the Guild's internally adopted, unilaterally enforced work rule. Because only the Guild's work rule is attacked, the fact that plaintiffs and the Guild have executed the Basic Agreement is not put in issue by this motion.

 Assuming, however, that the combination between plaintiffs and the Guild as evidenced by the Basic Agreement is in issue, Morris has not shown a likelihood of proving that the agreement is a combination between the Guild and a *nonlabor* group. In *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), the Court stated:

> The criterion applied by the District Court in determining that the orchestra leaders were a "labor" group . . was the "presence of a job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors. If such a relationship existed the independent contractors were a 'labor group' . . . ." 241 F.Supp., at 887. The Court of Appeals held, and we agree, that this is a correct statement of the applicable principles.

391 U.S. at 105–06, 88 S.Ct. at 1567, 20 L.Ed.2d at 466.

On the basis of this test, if an artists' manager is in an "economic interrela-

tionship affecting legitimate union interests" with the employee members of the Guild, then artists' managers are a labor group and no combination between a labor and a nonlabor group exists. If this economic interrelationship exists, the Guild may regulate the terms under which artists' managers represent Guild members and may enforce these terms with a work rule. *American Federation of Musicians v. Carroll*, 391 U.S. at 113, 88 S.Ct. at 1571, 20 L.Ed.2d at 470.

In part, the *Carroll* case involved a unilaterally adopted union work rule that permitted union members to accept engagements made by booking agents only if those agents were licensed by the union. Here, the Guild's work rule permits Guild members to enter into representation agreements with artists' managers only if those managers have signed the Guild's Basic Agreement. In applying the "economic interrelationship" test, the Court in *Carroll* stated:

> We think also that . . . booking agent restrictions "are . . . intimately bound up with the subject of wages" [*Teamsters Local 24 v. Oliver*, 362 U.S. 605, 606, 80 S.Ct. 923, 924, 4 L.Ed.2d 987, 988 (1960) (*Oliver II*)].
> . . . The District Court found that the booking agent regulations were adopted because of experience that "many booking agents charged exorbitant fees to members and booked engagements for musicians at wages which were below union scale." 241 F.Supp., at 881–882. On the basis of these findings, the District Court concluded:

> "Because the activities of the booking agents here have and had a direct and substantial effect on the wages of the members of [the unions], I find that they are in an economic interrelationship with the members * * * such that the [unions] are justified in regulating their activities * * *. Furthermore, I find the regulations to be reasonably related to their interest in maintaining observance of union scale wages and working conditions."

241 F.Supp., at 893.

391 U.S. at 113, 88 S.Ct. at 1571, 20 L.Ed.2d at 470.

The Guild and plaintiffs have likewise alleged that the packaging commissions charged by Morris are exorbitant, thereby depressing the wages received by writers employed to work on packages. If the booking agents in *Carroll* were in a sufficient "economic interrelationship" with union members to allow those agents to be considered a labor group, it is likely that the Guild will be shown to be in a similar economic interrelationship with artists' managers. This is, however, a factual question to be resolved at trial by examining the economic realities of the packaging business. *Carroll* arguably refutes Morris' contention that plaintiffs cannot, under any circumstances, be considered a "labor group" for the purposes of the statutory exemption to the antitrust laws.

The second prong of the *Hutcheson* test is whether the Guild's activity is in its "self-interest." Some cases, such as *Hunt v. Crumboch*, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945), indicate that unilateral union activity is exempt from the antitrust laws, despite the union's motives. Later cases, such as *Carroll*, have not used this expansive approach to determining union self-interest. *Carroll*, a statutory exemption case, analyzed in great detail whether the challenged agreement actually protected the wages, hours, or working conditions of union members. The Court used several seemingly interchangeable tests to determine the impact of the challenged agreement on the union's labor-related interests. These tests are:

(a) "legitimate [union] interest" (391 U.S. at 107, 88 S.Ct. at 1568, 20 L.Ed.2d at 467, quoting District Court's findings).

(b) "in actuality operate to protect the wages" (391 U.S. at 108, 88 S.Ct. at 1568, 20 L.Ed.2d at 467).

(c) "expressly designed to and did function as a protection of . .

wage scales" (391 U.S. at 108, 88 S.Ct. at 1568, 20 L.Ed.2d at 467).

(d) "means for coping with the job and wage competition . . . to protect the wage scales" (391 U.S. at 109, 88 S.Ct. at 1568, 20 L.Ed.2d at 468).

(e) "close relation to labor's efforts to improve working conditions" (391 U.S. at 109, 88 S.Ct. at 1569, 20 L.Ed.2d at 468 quoting *Teamsters Local 24 v. Oliver*, 358 U.S. 283, 294, 79 S.Ct. 297, 303, 3 L.Ed.2d 312, 320 (1959) (*Oliver I*)).

(f) "direct and frontal attack upon a problem thought to threaten the maintenance of the basic wage structure" (391 U.S. at 110, 88 S.Ct. at 1569, 20 L.Ed.2d at 468 quoting *Oliver I*, 358 U.S. at 294, 79 S.Ct. at 304, 3 L.Ed.2d at 320).

(g) "substantial effect on hours" (391 U.S. at 112, 88 S.Ct. at 1571, 20 L.Ed.2d at 470).

(h) "intimately bound up with the subject of wages" (391 U.S. at 113, 88 S.Ct. at 1571, 20 L.Ed.2d at 470 quoting *Oliver II*, 362 U.S. at 606, 80 S.Ct. at 924, 4 L.Ed.2d at 988).

(i) "reasonably related to their interest in maintaining observance of union scale wages and working conditions" (391 U.S. at 113, 88 S.Ct. at 1571, 20 L.Ed.2d at 470, quoting District Court's findings).

It thus appears that the test to determine if a union's actions are in its "self-interest" has not been precisely formulated. But the principle that emerges from the relevant cases is that a union's acts are in its "self-interest," as that term is used in *Hutcheson*, if they bear a reasonable relationship to a legitimate union interest.

█ In this case, provision 9 is in the Guild's self-interest if the elimination of package commissions could affect the wages or working conditions of employee members of the Guild. It must therefore be determined when Guild members function as independent businessmen or employees. *See Hills, Antitrust Adviser*,

§ 14.20 (1971). The affidavits and memoranda on file indicate that the Guild is composed of both independent businessmen and employees. Guild members, to the extent they function as package owners, are independent businessmen, while Guild members who perform writing services on the package for its owners are employees. Provision 9 of the Basic Agreement is, then, in the Guild's "self-interest" within the meaning of *Hutcheson* if it serves to protect the wages, hours, or working conditions of the employee members of the Guild.

Plaintiffs and the Guild advance two arguments to show that provision 9 could be considered protective of wages, hours, or working conditions. First, provision 9 eliminates the conflict of interest that exists when an artists' manager represents both a package owner and a writer hired by the package owner. Thus provision 9 theoretically assures an employee-writer of the undivided loyalty of his manager in protecting the writer's economic and professional interests. Second, the elimination of the package commission serves to preserve the total amount paid to the package owner for his package, thereby increasing the "wage pot" available for payment of writer-employee wages.

█ The impact of package commissions on the terms and conditions of employment of members of the Guild is a question to be resolved at trial. The fact that provision 9 directly relates to the amount a package owner receives, rather than the wages he pays his employee-writers, is not controlling. The actual impact of provision 9 on the interests of employee members of the Guild, not the form of the agreement, is the determining factor. *American Federation of Musicians v. Carroll*, 391 U.S. 99, 107, 88 S.Ct. 1562, 1568, 20 L.Ed.2d 460, 467 (1968); *Teamsters Local 24 v. Oliver*, 358 U.S. 283, 294, 79 S.Ct. 297, 303, 3 L.Ed.2d 312, 320 (1959); *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 690, n. 5, 85 S.Ct. 1596, 1602, 14 L.Ed.2d 640, 649 (1965).

Because of this potential conflict of interest, Guild members theoretically lack adequate representation by their managers. This inadequate representation may have a depressing effect on wages and working conditions. Eliminating Morris' dual representative capacity may therefore bear a reasonable relationship to a legitimate union interest—the interest in wage maintenance. The "wage pot" argument may also have some merit in light of *Carroll* and *Oliver I* and *II.*

Although this discussion makes certain factual assumptions based on the affidavits presented, it appears that plaintiffs and the Guild could prove that provision 9, as enforced by the work rule, is within the statutory exemption created by the Clayton and Norris-LaGuardia Acts, *i. e.,* the Guild is acting unilaterally or in combination with a labor group, and provision 9 bears a reasonable relationship to legitimate union interests. The current controversy would then be a "labor dispute" within the Clayton and Norris-LaGuardia Acts.

Even if the statutory exemption is not available to the Guild, the Guild's activities may come within the *nonstatutory* exemption to the antitrust laws. The nonstatutory exemption applies to a labor-nonlabor combination if the controversy is "intimately related to wages, hours and working conditions" (*Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 689, 85 S.Ct. 1596, 1602, 14 L.Ed.2d 640, 649 (1965)) and does not have "a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions" (*Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 635, 95 S.Ct. 1830, 1841, 44 L.Ed.2d 418, 433 (1975)). Provision 9 may be proven at trial to be "intimately related" to the wages of Guild members. Morris has not demonstrated a likelihood of proving that provision 9 gives the Guild market control beyond that needed to further its legitimate interest in maintaining the wages of its members.

 This motion raises numerous factual issues which must be resolved at trial: Is the Guild a group of employees or independent businessmen; did the Guild combine with a nonlabor group; does the Guild have a legitimate labor-related interest in eliminating package commissions; does provision 9 protect wages or fix prices. As the above discussion indicates, Morris has not shown a reasonable probability of proving that the Guild's activities fall outside of the labor exemption—statutory or nonstatutory—to the federal antitrust laws. At this stage of the proceedings, it is unnecessary for this court to consider whether the Basic Agreement would violate Section 1 of the Sherman Act.

Accordingly, the motion for a preliminary injunction is denied.