H. A. ARTISTS & ASSOCIATES, INC., S. T. E. Representation, Ltd., Don Buchwald & Associates, Inc., Marje Fields, Inc., Henderson/Hogan Agency, Inc., Joel Pitt, Ltd., Talent Representatives, Inc., D. M. I. Talent Associates, Ltd., Jean Thomas Agency, Inc., Bob Waters, Inc., William D. Cunningham & Associates, Inc., Tatrum, Robertson & Hughes, Inc., Monty Silver Agency, Inc., Lester Lewis Associates, Inc., Leaverton Associates, Ltd., Joe Jordan Talent Agency, Inc., Raglyn-Shamsky, Ltd., Ann Wright Representatives, Inc., Plaintiffs,

v.

ACTORS' EQUITY ASSOCIATION, an unincorporated association and Donald Grody, Defendants.

No. 78 Civ. 2452.

United States District Court, S. D. New York.

Oct. 24, 1979.

<hr>

Solin & Breindel by Howard Breindel, Frederick Gold, New York City and Bowditch & Dewey by Charles Donelan, Worcester, Mass., for plaintiffs.

Cohn, Glickstein, Lurie, Ostrin & Lubell by Nan C. Bases, Mary K. O'Melveny, New York City, for defendants.

### FINDINGS OF FACT

MOTLEY, District Judge.

Defendant Actors' Equity Association ("Actors' Equity") is a labor organization representing actors working in the legitimate theatre. Defendant Donald Grody ("Grody"), as Executive Secretary, is the chief executive officer of Actors' Equity. The plaintiffs are employment agencies located in New York City who operate as theatrical agents.

Actors' Equity has collective bargain agreements with most major theatrical producers in New York and elsewhere, with most off-Broadway producers, and with many other theatrical producers throughout the United States. The terms negotiated with various producer groups are the minimum terms and conditions of employment. An actor is free to negotiate salary or terms more favorable than those prescribed in the collective bargaining agreement, but neither the actor nor the producer is permitted to diminish the wages set forth in the relevant collective bargaining agreement.

Theatrical agents are independent contractors in the business of placing their actor clients in jobs with producers. Theatrical agents receive commissions, based on a percentage of earnings of the client, only if they succeed in obtaining employment for their clients.

Theatrical agents who operate in New York City are required to be licensed as employment agencies and are regulated by the Department of Consumer Affairs of New York City pursuant to article 11 of the General Business Law of the State of New York, which sets the maximum commissions employment agencies may charge and has specific provisions dealing with theatrical agents.

As a matter of general industry practice, producers seek actors and actresses for their productions through agents. Testimony in this case convincingly established that an actor without an agent does not have the same access to producers or the same opportunity to be seriously considered for a part as does an actor who has an agent. Even principal interviews, in which producers are required to interview all actors who want to be considered for principal roles, do not eliminate the need for an agent, who may have a greater chance of gaining an audition for his client.

Under Actors' Equity agency regulation system, agents are required to secure licenses, also known as permits or franchises, from Actors' Equity in order to represent Actors' Equity members. Licensed agents must abide by a schedule of maximum commissions established by Actors' Equity and must adhere to other rules designed to pro-

tect Actors' Equity members. Actors' Equity members are forbidden from dealing through agents who are not licensed by Actors' Equity, and members are subject to discipline for dealing with nonfranchised agents.

Theatrical Artists Representatives Association ("TARA") is a trade association of agents working in the legitimate theatre field. Discussions between Actors' Equity and TARA have resulted in several revisions in Actors' Equity regulations over the years. While holding an Actors' Equity franchise is a condition of membership in TARA, membership in TARA is not a condition to obtaining an Actors' Equity franchise.

Discussions between Actors' Equity and TARA in the 1950's resulted in the promulgation by Actors' Equity of "Rule A," which governed relations between Actors' Equity members and theatrical agents between 1958 and 1977. Rule A prescribed the minimum terms of contracts between actors and agents, including the maximum commissions which could be charged, the maximum duration for exclusive contracts, and the conditions warranting release from an exclusive contract. Rule A also established procedures for the granting of franchises, the discipline of agents, and the arbitration of disputes under the agency regulations.

The current Actors' Equity agency regulations also resulted from discussions between Actors' Equity and TARA. The course of these discussions and related events follows.

Discussions between Actors' Equity and representatives of TARA commenced in or about 1975. In the course of the discussions, TARA gave six months notice to "terminate" Rule A; this termination date was extended several times by mutual consent.

A major subject of the discussions was Rule A's provision prohibiting agents from charging commissions on jobs paying the minimum scale salary provided for in the collective bargaining agreements between Actors' Equity and the producers. In addition, Rule A prohibited commissions on re-hearsal pay, on pay for out of town expenses, and on "chorus" jobs. TARA demanded "10% from the first dollar," that is, a 10% commission on all monies received by the actor, regardless of whether the actor's salary exceeded the minimum scale. When Actors' Equity submitted to TARA a proposal that, while increasing commissions, did not meet this demand, TARA rejected the proposal and officially terminated Rule A on January 6, 1977. Agents who "resigned" their franchises pursuant to TARA's termination of Rule A were not permitted to represent Actors' Equity members except under pre-existing agency contracts. Rule A remained in effect for those agents who agreed to abide by it—these agents were permitted to represent Actors' Equity members for all purposes.

As negotiations continued, Actors' Equity drafted a revised commission schedule and new agency regulations, known as the "Equity Agency Regulations." These regulations provided that an agent could charge a 10% commission, so long as that commission did not invade the negotiated minimum, that an agent could charge a commission on off-Broadway contracts, and that expense money negotiated by Actors' Equity was not commissionable.

In May, 1977, seven agents, including five who are plaintiffs herein, filed a lawsuit in the United States District Court for the Southern District of New York, challenging Actors' Equity's franchising system under the antitrust laws (*Hidden v. Actors' Equity Association,* 77 Civ. 2624 (JMC)). The lawsuit was initiated and financed by TARA.

The lawsuit was withdrawn without prejudice in August, 1977, and in or about October, 1977, TARA and Actors' Equity reached agreement on the new Equity Agency Regulations. Most agents then resumed their franchises and began complying with the current Equity Agency Regulations. The new Equity Agency Regulations prohibit commissions on minimum scale jobs, chorus jobs, rehearsal pay, and out-of-town expense money.

On or about August 31, 1977, a group of agents, including the plaintiffs, informed Actors' Equity that they had resigned from TARA and that they wished to be represented by the National Association of Talent Representatives, Inc. (NATR), a trade association whose members were talent agents representing actors. Most of the plaintiffs have not been franchised by Actors' Equity since January, 1977. Actors' Equity has invited plaintiffs to become refranchised, but plaintiffs have decided to remain unfranchised.

In order to enforce its rule that members deal only through franchised agents, Actors' Equity has advised members that they could be disciplined for dealing with nonfranchised agents. It was Actors' Equity's practice to send a letter to an actor dealing with a nonfranchised agent, warning the actor that he could be disciplined—a copy of the letter was also sent to the nonfranchised agent. In 1979, Actors' Equity began disciplinary proceedings against members who were dealing with nonfranchised agents—members who would not agree to cease dealing with nonfranchised agents were fined after hearings.

The court finds, however, that Actors' Equity has not required producers to refrain from dealing with nonfranchised agents. While Actors' Equity requested producers not to deal with nonfranchised agents and notified producers that Actors' Equity members could be disciplined for dealing with nonfranchised agents, Actors' Equity never imposed or threatened to impose any sanctions on producers for dealing with nonfranchised agents. In June, 1978, Actors' Equity amended the language of Rule 2(A) in collective bargaining agreements between Actors' Equity and producers; the amendment clarified that actors were the only persons subject to any sanctions for dealing with nonfranchised agents.

Actors' Equity provides standard form individual employment contracts, which the actor and producer must sign when the actor becomes employed by a producer. These individual employment contracts provide blanks for identifying the parties to the contract (including the agent), the production, and essential terms such as the salary, the starting date, and the role to be played. In particular, in 1975 TARA requested Actors' Equity to add a line for identification of the agent into the standard form employment contract used under the "Production Contract" and used in Broadway shows. In 1977, Actors' Equity did print new standard form employment contracts containing a line for identification of the agent.

This court finds that producers were not, in fact, required to fill in the agent identification line on any of the standard form contracts. Producers could leave the agent's line blank, incurring no penalties or further inquiry from Actors' Equity. Even where Actors' Equity has had knowledge that a producer has failed to identify an agent on the standard form employment contract, the evidence does not show that Actors' Equity has taken action against the producer. In fact, producers have frequently not identified nonfranchised agents on the contract, at the request of the agents.

In short, this court finds no evidence to suggest the existence of any conspiracy or illegal combination between Actors' Equity and TARA or between Actors' Equity and producers. The Actors' Equity franchising system was employed by Actors' Equity for the purpose of protecting the wages and working conditions of its members.

## CONCLUSIONS OF LAW

Plaintiffs in this case allege that defendant Actors' Equity Association's ("Actors' Equity") franchising system and collective bargaining agreements violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 et seq. Defendants have raised the affirmative defense that defendants' conduct is protected under the statutory and nonstatutory exemptions to the antitrust laws. For the reasons stated below, this court concludes that defendants' conduct is protected under the statutory exemption to the antitrust laws, and accordingly, finds for defendants in this case.

Under Sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52, and under the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115, labor unions are not combinations or conspiracies in restraint of trade; these statutes exempt specific union activities, including secondary picketing and boycotts, from operation of the antitrust laws. *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 621–22, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Under this statutory exemption from antitrust laws, the Supreme Court held in *United States v. Hutcheson,* 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941) [footnote omitted], that the activities of a labor organization come within the exemption "[s]o long as a union acts in its self-interest and does not combine with non-labor groups."

In addition, the Supreme Court has fashioned a nonstatutory labor exemption from antitrust laws:

> The Court has recognized . . . that a proper accommodation between the congressional policy favoring collective bargaining under The NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions. . . .
>
> The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions.

*Connell Construction Co. v. Plumbers & Steamfitters, supra,* 421 U.S. at 622, 95 S.Ct. at 1835 [citation omitted].

In distinguishing between the statutory and nonstatutory exemptions, the Supreme Court has noted that "while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, . . . the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market." *Id.* at 622–23, 95 S.Ct. at 1835 [citation omitted].

This court need not decide whether the nonstatutory exemption is applicable in the case at hand, as this court concludes that the statutory exemption is directly applicable. In particular, this court concludes that under the Supreme Court's decision in *American Federation of Musicians v. Carroll,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), the activities of the defendants are protected under the statutory exemption to antitrust laws.

As noted above, the Court in *United States v. Hutcheson* established a two pronged test for determining whether a labor organization's activity falls within the statutory exemption: 1) whether a union has combined with nonlabor groups, and 2) whether a union has acted in its self-interest. *See United States v. Hutcheson, supra,* 312 U.S. at 232, 61 S.Ct. 463. As interpreted by the Second Circuit, "[t]he test of whether labor union action is or is not within the prohibitions of the Sherman Act is (1) whether the action is in the union's self-interest in an area which is a proper subject of union concern and (2) whether the union is acting in combination with a group of employers." *Intercontinental Container Transport Corp. v. New York Shipping Assoc.,* 426 F.2d 884, 887 (2d Cir. 1970); *accord, Robertson v. National Basketball Assoc.,* 389 F.Supp. 867, 889 (S.D.N.Y.1975).

In *American Federation of Musicians v. Carroll, supra,* the Supreme Court introduced an "economic interrelationship" criterion in determining whether a union has combined with nonlabor groups—the first prong of the *Hutcheson* test:

> The criterion applied by the District Court in determining that the orchestra leaders were a "labor" group and parties

to a "labor dispute" was the "presence of a job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors. If such a relationship existed the independent contractors were a 'labor group' and party to a labor dispute under the Norris-LaGuardia Act." . . . The Court of Appeals held, and we agree, that this is a correct statement of the applicable principles.

391 U.S. at 105–06, 88 S.Ct. at 1567 [citation omitted]. The Supreme Court in *Carroll* found that the economic interrelationship criterion had been satisfied, in light of the district court's finding that "the orchestra leaders performed work and functions which actually or potentially affected the hours, wages, job security, and working conditions of [the union's] members." *Id.* at 106, 88 S.Ct. at 1567 [footnote omitted].

The Court in *Carroll* specifically addressed the applicability of the "economic interrelationship" criterion to the union's regulation of booking agents:

We think also that the caterer and booking agent restrictions "are at least as intimately bound up with the subject of wages," . . . as the price floors. The District Court found that the booking agent regulations were adopted because of experience that "many booking agents charged exorbitant fees to members and booked engagements for musicians at wages which were below union scale." . . . On the basis of these findings, the District Court concluded:

"Because the activities of the booking agents here have and had a direct and substantial effect on the wages of the members of [the unions], I find that they are in an economic interrelationship with the members * * * such that the [unions] are justified in regulating their activities * * *. Furthermore, I find the regulations to be reasonably related to their interest in maintaining observance of union scale and working conditions." . . .

*Id.* at 113, 88 S.Ct. at 1571 [bracketed material in original].

In applying the second prong of the *Hutcheson* test, the Court did not specifically inquire whether the union's activity was in its own "self-interest." Instead, the *Carroll* Court appeared to use several interchangeable tests to determine whether the union's activity actually protected the wages, hours, or working conditions of union members. *See Adams, Ray & Rosenberg v. William Morris Agency,* 411 F.Supp. 403, 409–10 (C.D.Cal.1976). Thus, the Court seemingly applied the following tests:

1) whether "the union has a legitimate interest" (391 U.S. at 107, 88 S.Ct. at 1568);

2) whether the activities "in actuality operate to protect the wages" (*Id.* at 108, 88 S.Ct. at 1568);

3) whether the activities "were expressly designed to and did function as a protection of * * * wage scales" (*Id.* at 108, 88 S.Ct. at 1568);

4) whether the activities "are simply a means for coping with the job and wage competition . . . to protect the wage scales" (*Id.* at 109, 88 S.Ct. at 1569);

5) whether the activities bear "a close relation to labor's efforts to improve working conditions" (*Id.*);

6) whether the activities are "a direct and frontal attack upon a problem thought to threaten the maintenance of the basic wage structure" (*Id.* at 110, 88 S.Ct. at 1569);

7) whether the activities are "intimately bound up with the subject wages" (*Id.* at 113, 88 S.Ct. at 1571); and

8) whether the activities are "reasonably related to their interest in maintaining observance of union scale wages and working conditions" (*Id.*).

Thus, the Court in *Carroll* apparently was satisfied that the union's activities in that case were in the union's self-interest. The Court's analysis in *Carroll* was perhaps best characterized by the district court in *Adams, Ray & Rosenberg v. William Morris Agency, supra,* at 410:

It thus appears that the test to determine if a union's actions are in its "self-interest" has not been precisely formulated. But the principle that emerges from the relevant cases is that a union's acts are in its "self-interest," as that term is used in *Hutcheson,* if they bear a reasonable relationship to a legitimate union interest.

This court concludes that, under the standards set forth in *Hutcheson* and *Carroll,* defendants' activities clearly fall within the statutory labor exemption to antitrust laws. First, it is clear that the defendant Actors' Equity has not combined with nonlabor groups, as there is an economic interrelationship between Actors' Equity and the agents alleged by plaintiffs to be a "nonlabor group." In light of this economic interrelationship affecting the legitimate union interests of Actors' Equity, the agents were a "labor group" and party to a "labor dispute," thus falling within the statutory labor exemption to antitrust laws.

The record in this case leaves little doubt as to the economic interrelationship between the members of Actors' Equity and the agents. Testimony confirmed that agents play an integral role in the industry; without an agent, an actor would have significantly lesser chances of gaining employment. The evidence clearly supports the conclusion that agents perform work and functions which actually or potentially affect the wages, job security, and working conditions of Actors' Equity members. As in *Carroll,* the agents in this case have a direct and substantial effect on the wages of union members. In short, defendants have convincingly demonstrated an economic interrelationship between agents and Actors' Equity members, and accordingly, the first prong of the *Hutcheson* test is satisfied.

Defendants have satisfied the second prong of the *Hutcheson* test as well. The regulations imposed by Actors' Equity upon its members are without doubt designed to protect union wage scales. Both franchising of agents and the restrictions on agents' commissions operate to protect wage scales;

as in *Carroll,* these union activities are "a direct and frontal attack upon a problem thought to threaten the maintenance of the basic wage structure." In short, this court finds that the activities of Actors' Equity bear a reasonable relationship to legitimate union interests—union scale wages and working conditions.

Plaintiffs have offered a number of theories in their attempt to distinguish the case at hand from *Carroll.* First, plaintiffs argue that in *Carroll* the union members did not have a collective bargaining agreement with employers, such as the "father of the bride," while in the case at hand Actors' Equity has collective bargaining agreements with most of the employers of its members. This argument is of no avail, however, as Actors' Equity has a legitimate union interest in protecting its members' wages and working conditions, even beyond whatever protection is already afforded by collective bargaining agreements. Moreover, the Court's holding in *Carroll* was in no way limited to those instances where union members were not employed under collective bargaining agreements.

Second, plaintiffs argue that in *Carroll* the orchestra leaders were in competition with union members for jobs, while in the case at hand agents are not in competition with members of Actors' Equity. Plaintiffs' argument seriously misconstrues *Carroll,* unjustifiably limiting its holding to cases involving competition between union members and the alleged "nonlabor" group. In fact, *Carroll* explicitly applies where there is the "presence of a job or wage competition *or* some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors." 391 U.S. at 105–06, 88 S.Ct. at 1567 [emphasis added]. Plaintiffs' assertion that the term "economic interrelationship" is to be narrowly construed to cover situations involving actual competition is without support; the plain meaning of the Court's language in *Carroll* is that an economic interrelationship affecting legitimate union interests between Actors' Equity members and their agents will

suffice. This court recently stated in *Robert Redfield, d/b/a The Redfield Agency v. American Federation of Musicians of the United States and Canada, AFL–CIO*, 71 Civ. 3091 (S.D.N.Y. Sept. 18, 1978):

> Plaintiff argues that *Carroll* does not apply to professional booking agents such as plaintiff, but only to booking agents who also work as orchestra leaders, as did the plaintiffs in *Carroll.* Neither the language nor the rationale of *Carroll* limits its holding to cases where the booking agent is also an orchestra leader.

In short, this court concludes that *Carroll*'s economic interrelationship criterion is not limited to cases involving actual competition.

Third, plaintiffs argue that in *Carroll* booking agents apparently were not licensed or regulated by any government agency, while in the case at hand agents are licensed by the Department of Consumer Affairs of New York City and are comprehensively regulated pursuant to article 11 of the General Business Law of the State of New York. Plaintiffs' argument would perhaps carry some force, if in fact the New York licensing and regulation afforded members of Actors' Equity the same protection as the union activities in question. However, it is clear that Actors' Equity is attempting to afford protection beyond that of New York law, both by protecting members who work outside of New York and by affording protection much more comprehensive than that of New York law. The existence of protection under New York law should not preclude union attempts to protect further the interests of union members.

Fourth, plaintiffs argue that in *Carroll* the licensing provisions in question were enacted unilaterally by the union, while in the case at hand the franchising provisions were "part of a sweetheart deal to benefit TARA to the exclusion of other agents" and "part of a larger combination and conspiracy in violation of the antitrust laws." As this court's findings of fact indicate, plaintiff has not successfully demonstrated the existence of any such sweetheart deal or

conspiracy. Plaintiffs have not demonstrated that Actors' Equity's regulation of agents was either applied in a discriminatory fashion favoring TARA agents or was designed to operate to the advantage of TARA agents. While TARA did request Actors' Equity to enforce the rule that Actors' Equity members may not deal with nonfranchised agents, this could hardly be a conspiracy against the plaintiffs, as the plaintiffs were TARA members at the time. Nor is TARA's agreement to Actors' Equity's increase of franchise fees sufficient evidence of conspiracy.

In cases where a plaintiff alleges a conspiracy in violation of the Sherman Act against a union, the plaintiff must meet the "clear proof" standard of proof. *Ramsey v. United Mine Workers of America*, 416 F.2d 655, 661–63 (6th Cir. 1969). In the case at hand, plaintiff has met neither the "clear proof" standard nor the more usually applicable "preponderance of the evidence" standard in its attempt to demonstrate a conspiracy between TARA and Actors' Equity.

Fifth, plaintiffs argue that in the case at hand producers conspired with Actors' Equity to not deal with nonfranchised agents. In support of this contention plaintiffs offered hearsay evidence consisting of testimony by plaintiffs' witnesses as to statements made by producers allegedly in furtherance of the conspiracy. This court took the testimony subject to proof by plaintiffs with independent evidence of the existence of such a conspiracy. The court reserved decision on defendants' subsequent motions to strike the hearsay testimony. Upon careful consideration of the record, this court now grants defendants' motion to strike, as plaintiffs have failed to prove with independent evidence the existence of any conspiracy. While this court's findings of fact discuss in detail the independent evidence allegedly establishing the existence of a conspiracy, a brief recapitulation is in order.

While Actors' Equity did request producers to refrain from dealing with nonfranchised agents, plaintiffs have not demonstrated that Actors' Equity required pro-

ducers to refrain from dealing with non-franchised agents. Such requests certainly do not suffice to demonstrate the existence of a conspiracy. Nor do Actors' Equity's restrictions upon its own members constitute a conspiracy. Finally, plaintiffs have not successfully demonstrated a conspiracy resulting from the alleged requirement of Actor's Equity that producers identify the agent of record on the standard form individual employment contracts. In summary, as the plaintiff has failed to demonstrate with independent evidence the existence of a conspiracy between Actors' Equity and producers, the hearsay evidence as to statements of producers must be struck from the record.

Finally, plaintiffs argue that the restrictions imposed by Actors' Equity's franchising system do not further any legitimate labor objective. In particular, plaintiffs focus their challenge upon several features of the franchising system. Plaintiffs object to the prohibition of commissions on scale wage jobs, chorus jobs, out-of-town expense money, and rehearsal wages. Plaintiffs' assertion that commissions affect an actor's disposable income but do not affect wages is unpersuasive. This court concludes that, under the facts of this case, commissions on these items are intimately bound with the subject of wage scales. Unlike theatre ticket prices, photographers' fees, commuting costs, or grocery prices, commissions are directly and proportionately related to wages.

Plaintiffs also object to the requirement that agents pay fees in order to be franchised. This court is of the opinion that the franchise fees are reasonably related to the operation of the franchise system and the system's protection of wage scales and working conditions. While conceivably Actors' Equity might someday decide to charge a fee so high as to not be reasonably related to the operation of the franchise system and its goals, the facts before this court do not present that situation. In summary, this court finds that the franchising system of Actors' Equity is reasonably related to legitimate labor objectives.

Since this court concludes that defendants' activities are protected under the statutory labor exemption to antitrust laws, it is unnecessary to address several issues presented by defendants: whether Actors' Equity's regulations are unreasonable restraints of trade, whether plaintiffs are barred by their conduct from obtaining equitable relief, and whether an action can be maintained against defendant Grody in his individual capacity.

This court concludes that defendant Actors' Equity acted in its own self-interest concerning matters intimately bound with wage scales and working conditions, and without conspiring or combining with any nonlabor group. Accordingly, defendants are protected by the statutory exemption from antitrust laws. This court finds that the complaint in this action should be dismissed and judgment entered for defendants.

So ordered.