ALLIED INTERNATIONAL,
INC., Plaintiff,

v.

INTERNATIONAL LONGSHOREMEN'S
ASS'N, AFL–CIO et al., Defendants.

Civ. A. No. 80–584–S.

United States District Court,
D. Massachusetts.

June 17, 1980.

Duane R. Batista, Nutter, McClennen & Fish, Boston, Mass., for plaintiff.

Gary G. Nicolosi, Thomas W. Gleason, New York City, Joseph T. Doyle, Condon & Doyle, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

SKINNER, District Judge.

Plaintiff Allied International, Inc. ("Allied") seeks preliminary injunctive relief against the International Longshoremen's Association, AFL–CIO ("ILA"), its local un-

ions and various union officials for their concerted refusal to load and unload ships engaged in trade with the U.S.S.R. Plaintiff asserts this action contravenes the National Labor Relations Act secondary boycott provisions, 29 U.S.C. §§ 158(b)(4)(i), (ii)(B), the Sherman Antitrust Act, 15 U.S.C. § 1 et seq., and the common law protection against intentional interference with contractual relations. Defendants have moved to dismiss the complaint.

This action was consolidated with *Walsh v. International Longshoremen's Assoc.*, 488 F.Supp. 524 (D.Mass.1980), a case in which I denied the National Labor Relations Board's application for an injunction under § 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*). The facts were fully set forth in that opinion. It is sufficient for present purposes to recount that Allied is a Massachusetts importer of wood products from the Soviet Union and has been informed by the defendants that no ILA members would unload any cargo originating in the U.S.S.R., pursuant to a directive issued January 9, 1980 by Thomas Gleason, President of the ILA, ordering this action in response to the Soviet invasion of Afghanistan. As a result, certain wood shipments were cancelled, curtailed, or unloaded prematurely by Allied's carrier, Waterman Steamships Lines, and other cargoes are amassed on the docks of Leningrad, pending resolution of this conflict or alternative arrangements.

The National Labor Relations Board ("NLRB") sought to enjoin the ILA's refusal to work on certain ships on the ground that such refusal constituted a secondary boycott, in violation of 29 U.S.C. §§ 158(b)(4)(i), (ii)(B). My denial of the § 10(*l*) petition was based on my explicit characterization of the dispute as "exercise of political protest."

> The ILA has not induced a strike against Allied, Waterman, or Clark [the stevedoring company]; nor does it seek to pressure those employers not to deal with one another. No picket lines have been established and no other employees have been prevented from work. Union members have simply declined to accept employment on certain ships, as a form of political protest. . . . This is a primary boycott of Russian goods, with incidental effects upon those employers who deal in such goods. As such, the actions of the respondents may not be prohibited by §§ 8(b)(4)(i), (ii)(b).

*Walsh v. ILA, supra* at 530.

Allied has carried on the battle, by pursuing private remedies in the present case. I shall deal with defendants' motion to dismiss first, as the facts are undisputed and the questions presented are purely legal ones which have been extensively briefed by the parties.

In Count I of its complaint, Allied seeks a private damage remedy under § 303 of the National Labor Relations Act, 29 U.S.C. § 187, alleging the same substantive violation of the secondary boycott provisions as were alleged by the NLRB in *Walsh*. My holding in *Walsh* applies as the law of the case in this consolidated action, and thus precludes Allied from asserting a claim under the National Labor Relations Act.

Allied also seeks injunctive and monetary relief under the Sherman Antitrust Act, 15 U.S.C. § 1, against defendants for their concerted refusal to deal, resulting in restraint of trade. The defendants contend that their actions (or non-actions) fall within the "labor exemption" to the antitrust laws, and that their actions are not otherwise punishable by the antitrust laws for lack of any purposeful restraint of trade or conspiracy.

The history of the application of injunctions and antitrust law to labor union activity and the legislative enactments as reactions thereto have often been described. *See, e. g., Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). The Sherman Act, enacted in 1890, prohibited "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

. . . ." 15 U.S.C. § 1. As a result of the primary use of this statute against labor unions rather than the business "trusts" and combinations at which it was aimed, Congress passed § 20 of the Clayton Act of 1914 which exempted from the antitrust laws specific union practices by prohibiting injunctions against them in cases "involving, or growing out of, a dispute concerning terms and conditions of employment." 29 U.S.C. § 52. After the Supreme Court interpreted that statute to apply only to union activities directed against an employer by his own employees, *Duplex Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), Congress enacted the Norris-LaGuardia Act in 1932, further broadening labor's protection against injunctions in cases "involving or growing out of a labor dispute." 29 U.S.C. § 101.

█ The first Supreme Court decision following these legislative pronouncements did not recognize any broad based exemption for labor union activity. Instead, in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), the Court utilized traditional Sherman Act analysis to find that a violent sit-down strike did not constitute a "restraint of trade" as understood at common law. A union would be held liable only if its activities had the purpose or effect to fix the commodity price, monopolize supply, or otherwise control the market. *Id.* at 512, 60 S.Ct. at 1002. A year later, the Court decided to treat labor and non-labor combinations differently. In *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), the Court read the Sherman, Clayton and Norris-LaGuardia Acts together in creating a new test for the issuance of anti-trust injunctions against union activity:

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and illicit under § 20 [of the Clayton Act, 29 U.S.C. § 52] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Id.* at 232, 61 S.Ct. at 466. Unions may thus qualify for a "labor exemption" from the antitrust laws so long as they do not combine with non-labor groups and act in their "self-interest", despite an apparent common law restraint on competition.

█ Both prongs of this standard have been further developed by the Supreme Court. Although a union's activities fall within the protection of the Clayton Act, it may be enjoined where it acts in combination with employers to restrict competition or control the product market. *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers*, *supra*. On the other hand, where the union is not acting in a conspiracy with employers, the purpose behind its actions, as well as the impact of those actions upon the product market will be examined to determine liability. *American Federation of Musicians of the United States and Canada v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968); *Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).

In the present case, the ILA did not agree, conspire or otherwise combine with non-labor groups to institute its boycott of Soviet goods. The carrier, Waterman, made alternative arrangements upon learning of the dock workers' decision, but this acquiescence does not constitute an agreement. The ILA members simply refused to work; they did not hinder or seek to control Allied's business arrangements with anyone.

The definition of "self-interest", as used in the *Hutcheson* test, has not been precisely outlined. In *Jewel Tea*, the Court analyzed a marketing hours restriction to determine whether it affected the wages, hours, and other terms and conditions of employment of union members. In *Carroll*, the Court looked at the goals behind various union regulations imposing, *inter alia*, minimum prices for musicians, and found the

restrictions exempt due to the union's legitimate interest in maintaining a basic wage structure and improving working conditions. The emerging principle is that a union's acts are in its self-interest, " . . . if they bear a reasonable relationship to a legitimate union interest." *Adams, Ray & Rosenberg v. William Morris Agency,* 411 F.Supp. 403, 410 (C.D.Cal.1976). *Accord, H. A. Artists & Assoc., Inc. v. Actors Equity Assoc.,* 478 F.Supp. 496, 501–2 (S.D.N.Y.1979).

▌ The ILA's actions here do not relate to a "legitimate union interest" as it has been defined in American labor history and law. This political protest falls outside of the traditional union activities concerning terms and conditions of employment. This conclusion is bolstered by the Clayton and Norris-LaGuardia Acts reference to "labor disputes" only, supporting the fair inference that federal courts are not prohibited from issuing injunctions in "political disputes" under these acts. I must find, therefore, that the defendants' activities do not fall within the "labor exemption" to the antitrust laws.

It does not follow, however, that the union's action here constitutes a violation of the Sherman Act. Although the framework of analysis used in *Apex Hosiery* has been subsequently modified, its holding that the purpose of the antitrust law was to prevent restraints in business and commerce which tended "to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services," is still viable. *See Jewel Tea, supra* 381 U.S. at 690 n.5, 85 S.Ct. at 1602 n.5 ("The crucial determinant is not the form of the agreement—e. g., prices or wages—but its relative impact on the product market and the interests of union members.").

The Supreme Court has specifically refused to "impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of the Act." *Eastern Railroad Presidents Conference v. Noerr Motor Freight,*

*Inc.,* 365 U.S. 127, 137, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961). The First Circuit has recently reaffirmed this doctrine in a case involving access to the public media by political organizations. *Council for Employment and Economic Energy Use v. WHDH Corp.,* 580 F.2d 9 (1st Cir.) *cert. denied,* 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 634 (1978). The Eighth Circuit has similarly refused to apply antitrust sanctions against a boycott related to the passage of the Equal Rights Amendment, unrelated to any economic interests, albeit with adverse economic impact upon innocent third parties. *State of Missouri v. National Organization of Women, Inc.,* 620 F.2d 1301 (8th Cir. No. 79–1379 March 28, 1980), *aff'g* 467 F.Supp. 289 (W.D.Mo.1979).

Admittedly, the present case does not involve the right to petition the government for specific legislative enactments, as in the *Noerr* and *NOW* decisions. Nor does this case involve purely political opponents seeking to influence political decisions of the electorate, as in the *WHDH* decision.

I am presented here, however, with political activity in the sense of a direct political protest against the Soviet Union's foreign policy. While commerce between Allied and the Soviet Union and, ultimately, the American people is being restrained by the ILA's refusal to handle certain cargo, this refusal is wholly politically oriented with no apparent economic benefit accruing to the union or its members. The ILA is not seeking to control the market in any way, as was envisioned by the Court in *Apex Hosiery;* it merely wishes to register its protest. In such a situation, the Supreme Court's admonition in *Noerr* is particularly relevant:

Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this court interpreting such legislation. All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a

commercial impact and involve conduct that can be termed unethical. *Noerr, supra* 365 U.S. at 141, 81 S.Ct. at 531.

Moreover, the ILA is imposing no direct restraint on Allied, its customers or suppliers. Allied is still free to unload its ships by non-union personnel. ILA members have not boycotted any ships not involved in trade with the Soviet Union, including those ships owned by carriers who maintain Russian trade elsewhere. A mere refusal to work, with no economic coercion to accede to specific anticompetitive union demands, has never been held a violation of the antitrust laws. *See Hunt v. Crumboch,* 325 U.S. 821, 824, 65 S.Ct. 1545, 1546, 89 L.Ed. 1954 (1945). Unions have been held liable only for direct affirmative restrictions upon product market competition. *See, e. g., Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100, United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

Accordingly, I find that the defendants have not engaged in a "restraint of trade" as defined by the antitrust laws, and this count must be dismissed.[1]

Plaintiff also alleges that defendants' actions constitute the tort of interference with business relationships and is actionable under general federal admiralty law. Where an alleged tort affects the operation of ocean-going vessels and bears a relationship to maritime service, commerce, or navigation, the cause of action is cognizable in admiralty. *Carroll v. Protection Maritime Insurance Co., Ltd.,* 512 F.2d 4

(1st Cir. 1975). In such a case, it is appropriate to adopt the Restatement, Second, Torts (1977) as the substantive rule of decision. *Pino v. Protection Maritime Insurance Co., Ltd.,* 599 F.2d 10 (1st Cir. 1979).

> § 766 Intentional Interference With Performance of Contract by Third Person.
>
> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

A mere refusal to deal cannot constitute an interference as every worker may decline to offer his services just as every buyer may decide not to purchase. So long as no intentional and affirmative intrusion into Allied's business affairs has taken place, the defendants may not be held liable for their politically motivated refusal to handle Russian cargoes.[2]

Accordingly, defendants' motion to dismiss is ALLOWED, and plaintiff's motion for a preliminary injunction is DENIED.

---

1. Given my disposition of the Sherman Act claims, I need not reach defendants' argument that no conspiracy may exist when a union acts "unilaterally" with its members and locals. I note, however, that the Supreme Court had no problem with this issue in *Carroll,* and all the cases cited by the defendant relate to corporations and their subdivisions or officers. In addition, counsel for the defendants repeatedly stressed at oral argument the independent nature of each local's decision, characterizing the January 9 directive as one of "policy", not "command".

2. The same result would have occurred under Massachusetts law, which requires a legally protected interest, intentionally invaded by conduct either per se unlawful or conducted with malice, and damages. *Old Colony Donut, Inc. v. American Broadcasting Cos., Inc.,* 368 F.Supp. 785, 787 (D.Mass.1974); *Caverno v. Fellows,* 300 Mass. 331, 333, 15 N.E.2d 483 (1938).