COSTELLO PUBLISHING CO., et al., Appellants,

v.

John E. ROTELLE, O. S. A., et al.

COSTELLO PUBLISHING CO., INC., et al.

v.

John E. ROTELLE, O. S. A., et al., Episcopal Conference of Australia, et al., Appellants.

Nos. 80–2147, 80–2196.

United States Court of Appeals, District of Columbia Circuit.

Argued June 15, 1981.

Decided Nov. 10, 1981.

As Amended Dec. 16, 1981.

Charles R. Work and Nathalie P. Gilfoyle, Washington, D. C., with whom Timothy J. Waters, Lawrence White and Jeffrey N. Martin, Washington, D. C., were on the brief for Costello Pub. Co., Inc., et al., appellants in No. 80–2147 and appellees in No. 80–2196.

Terence P. Boyle, Washington, D. C., with whom Wilfred R. Caron, Washington, D. C., was on the brief for John E. Rotelle, O. S. A., et al., appellees in No. 80–2147 and No. 80–2196.

G. Franklin Rothwell, Washington, D. C., with whom Cynthia E. O. Clarke, Washington, D. C., was on the brief for The Episcopal Conference of Australia, et al., appellees in No. 80–2147 and cross-appellants in No. 80–2196.

Before McGOWAN, Senior Circuit Judge, and WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case involves a dispute between lay and clerical members of the Roman Catholic Church, who also share a commercial relationship. It began as an antitrust action initiated by the Costello Publishing Co. ("Costello")[1] against officials of the Roman Catholic Church in the United States, the Bishops' Committee on the Liturgy ("BCL"), the National Conference of Catholic Bishops ("NCCB"), the United States Catholic Conference, Inc. ("USCC"), Catholic Book Publishers, Inc. ("CBP"), as well as unnamed alleged co-conspirators, publishers and retail distributors, asserting violations of the Sherman Act, 15 U.S.C. §§ 1–2, and requesting treble damages and injunctive relief. Costello's complaint was based upon defendants' efforts to discourage Catholic book retailers from distributing a work entitled *Morning and Evening Prayer* ("accused book"). The defendants responded by claiming a first amendment exemption from the antitrust laws. The Episcopal Conferences of Australia, England and Wales, and Ireland ("Episcopal Conferences") sought and were granted permission to intervene and then counterclaimed copyright infringement and unfair trade practices against Costello.[2] Costello then

---

1. The President of Costello Publishing Co. is Harry J. Costello. In addition to his marketing activities involving Catholic books, Mr. Costello is a consultant to major religious book publishing houses in this country and abroad, including Collins Publishing, a past chairman of the Publishers Committee of the National Association of Catholic Publishers and Dealers in Church Goods, and the American agent of Do-

minican Publications. *See* Joint Appendix (J.A.) at 219.

2. *See* 15 U.S.C. § 1125(a) and 17 U.S.C. §§ 502–503. 15 U.S.C. § 1125(a) provides:

 (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or

amended its complaint to include intervenors among defendants, and moved to dismiss intervenors' counterclaims for failure to join an indispensable party. The district court granted plaintiffs' motion to dismiss the counterclaims and ruled in favor of defendants on the antitrust issue. Because the counterclaims should not have been dismissed, we *remand* so that the parties will have an opportunity to address the issues presented by the counterclaims. If intervenors show copyright infringement and unfair trade practices,[3] then the counterclaims may not be dismissed for failure to join an indispensable party, and there may be no occasion to address the antitrust issues. However, to conserve judicial resources, we offer the district court some guidance on the antitrust issues, should they eventually need to be resolved.

## I. BACKGROUND

At the Second Ecumenical Council of the Vatican in 1962 ("Vatican II"), the Roman Catholic Church decided to permit use of vernacular language rather than Latin in the Church's liturgy. To implement the decision of Vatican II, NCCB (the Episcopal Conference of the United States), and ten other episcopal conferences in English-speaking countries joined together to form the International Commission on English in the Liturgy ("ICEL") to provide common English translations of Latin liturgical texts and to exercise common copyright control over those translations. The ICEL has no authority of its own, but acts only as agent of the member conferences. J.A. 1310, 1311. Its translations can be distributed only in those countries where the translations have been approved by that country's episcopal conference.

As copyright holder, ICEL receives royalties from the sale of liturgical books containing ICEL translations. Surplus profits from royalties paid to ICEL by its licensees are distributed to its members according to a formula based upon the amount of capital

any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

17 U.S.C. § 502 provides:

(a) Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

(b) Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.

17 U.S.C. § 503 provides:

(a) At any time while an action under this title is pending, the court may order the impounding, on such terms as it may deem reasonable, of all copies or phonorecords claimed to have been made in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

(b) As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

**3.** The Second Circuit has recently noted that there may be a violation of the Lanham Act, 15 U.S.C. § 1125(a), with respect to common-law copyright. *Gilliam v. American Broadcasting Companies,* 538 F.2d 14, 24–25 (2d Cir. 1976) (hereinafter *Gilliam*). Therefore, hereinafter both counterclaims asserted here will be referred to as "copyright infringement" or simply as "counterclaims."

contribution by each member. The NCCB receives over three-quarters of ICEL's surplus. J.A. 1604–05.

Dissatisfied with the pace of the ICEL's work, the Episcopal Conferences joined together with publishers and translators in 1971 to form a new consortium for the purpose of commissioning and publishing a translation of *Liturgia Horarum.* The consortium, known as the English Language Breviary Committee ("ELBC"), consisted of representatives of the three participating Episcopal Conferences and representatives of publishing companies from their respective countries—E. J. Dwyer of Australia, Collins Publishing of Great Britain, and Talbot Press of Ireland. The ELBC produced a three volume translation in 1974 entitled *The Divine Office.* The work was copyrighted by the Episcopal Conferences and their publishers were given exclusive licenses to publish. Late in 1975, the first volume of the ICEL's multi-volume translation of *Liturgia Horarum,* entitled *Liturgy of the Hours,* was published. In March, 1976, Talbot Press published a one volume edition of *The Divine Office,* entitled *Morning and Evening Prayer*—the accused book. Talbot Press published 10,000 copies of the accused book and sold them all to Dominican Publications.

The idea of the accused book was conceived by Alexander Tarbett, then managing director of Talbot Press, and Austin Flannery, O.P., a Dominican Priest and manager of Dominican Publications. Patrick McGoldrick, a Roman Catholic Priest and an advisor to the Irish Bishops Conference, represented the interests of the Episcopal Conferences. He advised the Episcopal Conferences that he had read the proofs of the accused book and that "the edition fulfilled all the requirements." J.A. 62; *see also* J.A. 55, 56. McGoldrick found that the accused book "contained no newly set material but only material which has been re-arranged from 'The Divine Office' and 'Daily Prayer.' " *Id.* at 62. In fact, the accused book contained passages from the *Revised Standard Version,* substituted for passages from the *Jerusalem Bible,* because of difficulties in acquiring permission to use pas-

sages from the *Jerusalem Bible* from Doubleday, the *Jerusalem Bible* copyright holder in America.

Dominican Publications sold 7,500 copies of the accused book to Costello. In May, 1976, Costello advertised and began selling the accused book in the United States as an "officially approved" edition of *Liturgia Horarum.* J.A. 81. The accused book then came to the attention of the BCL, which administers the duties of the NCCB regarding publication, distribution and use of liturgical texts. The BCL also monitors liturgical works available for use by Roman Catholics in the United States. Father Thomas Krosnicki, then assistant director of the BCL, contacted Mr. Harry J. Costello, informed him that the work was not one which had been approved by the NCCB, and requested that a copy of it be sent to the BCL, for review. Mr. Costello refused the request and shortly thereafter the BCL made good on its warning that without an opportunity to review the book, the BCL would notify Catholic book dealers that the book was not an approved version of the *Liturgy of the Hours.* On May 26, 1976, the BCL, through its director, Father John E. Rotelle, O.S.A., distributed "Memorandum 5" to a large number of retailers throughout the country. That memorandum requested that book retailers not distribute the accused book. J.A. 487. Existing orders were cancelled and new orders virtually ceased. Costello responded by bringing an antitrust action against individual members of the BCL, the BCL, the NCCB, the USCC, CBP, individual officials of the Catholic Church, and unnamed alleged co-conspirator publishers and retailers.

The defendants enlisted the aid of the Episcopal Conferences, J.A. 408–10, who intervened and counterclaimed copyright infringement. Costello then amended its complaint to include intervenors among defendants and moved to dismiss the counterclaims for failure to join an indispensable party—Talbot Press. Costello argued that the counterclaims were essentially contract claims and that all parties to the contract must be joined. The district court agreed

and dismissed the counterclaims. On appeal this court held:

> In view of the fact that the District Court's holding deprives appellants of any opportunity to pursue their infringement and false advertising claims against appellee, we believe that the District Court's ruling was premature. Under Rule 28(b) the parties may seek discovery of documents and testimony in the possession of Talbot Press in Ireland through letters rogatory.... We believe the equitable concerns of Rule 19 will be better served if the District Court reserves its ruling on appellee's motion to dismiss until after a good faith attempt is made to acquire Talbot Press' evidence.[4]

On remand, Costello applied for issuance of letters rogatory, which were granted by the district court in July, 1979. Although only a limited response was forthcoming, the district court found that a "good faith," but unsuccessful, attempt to acquire Talbot Press' evidence had been made and granted plaintiff's motion to dismiss the counterclaims. However, with respect to the antitrust claim, the district court held that the actions of the defendants were motivated exclusively by religious concerns and had no commercially competitive design. "Such religiously motivated conduct," said the court, "is not the type which falls within the realm of the antitrust laws, and summary judgment must be granted in favor of the defendants."[5] Costello appealed and defendant-intervenors cross-appealed. The appeals have been consolidated.

## II. ISSUES PRESENTED

The first question presented by this appeal is whether the district court properly dismissed the counterclaims because of the joinder requirements of Rule 19(a) of the Federal Rules of Civil Procedure?[6] When this issue came before us earlier, we ruled that the district court had prematurely dismissed the counterclaims. *See* pp. 1040–1041 *supra.* We believe that is still the case, for if Talbot Press materially breached its licensing agreement with the Episcopal Conferences or if any breach constituted a failure to satisfy a condition to the copyright license, an infringement of copyright as well as a breach of contract may have resulted. *See* pp. 1045–1046 *infra.* Because the district court erroneously treated a breach of the licensing agreement as giving rise to a contract claim only, *see* pp. 1042–1043 n.9 *infra,* it did not adequately address the merits of the copyright counterclaims. Instead it ruled against defendant-intervenors solely on the basis that in a contract action Talbot Press was an indispensable party under Rule 19(a) and could not be joined. That indispensable party barrier would not, however, stand in the way of a copyright infringement counterclaim. *See* pp. 1042–1045 *infra.* Accordingly, we remand to allow the district court to consider whether there was a material breach of the licensing agreement or whether any breach amounted to a failure to satisfy a condition to the license so as to give rise to a copyright infringement claim.

---

4. *Costello Publishing Co., Inc. v. John E. Rotelle, O. S. A., et al.,* No. 79–1019 (D.C.Cir. May 17, 1979), mem. op. at 1, J.A. 758.

5. *Costello Publishing Co., Inc. v. John E. Rotelle, O. S. A., et al.,* No. 76–1930 (D.D.C. August 22, 1980), mem. op. at 3–4, J.A. 945–46.

6. Rule 19(a) of the Federal Rules of Civil Procedure provides:

 A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

One remedy for copyright infringement is the destruction of the material produced in violation of the copyright owners' exclusive rights. *See* 17 U.S.C. § 503(b). Thus *if* Costello, as a member of the chain of distribution, is found to have infringed the copyright held by the Episcopal Conferences *and if* the appropriate remedy would deprive Costello of the accused books, then the antitrust issues need not be decided at all.[7] But since this is the second time this case has been before this court, the original complaint having been filed five years ago, simply to remand the issues presented by the counterclaims, without offering the district court our guidance on the antitrust issues, might not promote the speedy and final resolution of this case. The district court granted summary judgment on the antitrust issues because it found that the actions of defendant-intervenors were "religiously motivated conduct," which it held was "not the type [of conduct that] falls within the realm of the antitrust laws . . . ."[8] We disagree with the district court's resolution of the antitrust issues and hold that there is no such blanket religious exemption from the antitrust laws. The district court should therefore have decided initially whether the actions of defendant-intervenors were in violation of the antitrust laws.

## III. ANALYSIS

### A. The Joinder Requirement in Copyright Actions

The district court's dismissal of defendant-intervenors' counterclaims appears to have been dictated by the court's determination that the counterclaims hinged upon an interpretation of a licensing agreement between the Episcopal Conferences and Talbot Press as to the terms under which the accused books could be published and distributed.[9] But the district

---

7. *See Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). There the Supreme Court held that "for plaintiffs to recover on account of § 7 violations, they must prove more than injury casually linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697. The plaintiffs in *Brunswick* operated bowling centers that competed with those acquired by defendant. The plaintiffs charged that absent the acquisitions, the acquired centers would have gone out of business and the result would have been less competition and greater profits for the plaintiffs. The lower court found the acquisition unlawful under § 7. Without disturbing that finding, the Supreme Court unanimously held that the plaintiffs' "injury" resulted from lawful competition. The plaintiff would have suffered the identical "loss" had the acquired centers, instead of being acquired by a deep-pocket parent, obtained refinancing or been purchased by a shallow-pocket parent. Thus, according to *Brunswick,* the antitrust injury must be directly caused by the alleged anticompetitive behavior. In the present case, if there has been an infringement of copyright and the appropriate remedy would deprive Costello of the accused books, judicial relief for Costello with respect to his antitrust claim will not remedy his injury. *See also Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A finding of copyright infringement, remedied by destruction of the accused books, would thus deprive plaintiff of any right to antitrust remedies. We should emphasize that if a copyright infringement is found, we are *not* indicating here that the appropriate remedy would be destruction of the books. We leave the question of remedy to the district court, as we must, for we are not even able to say whether there has been a copyright infringement let alone to tailor a remedy to fit the form of any infringement.

8. *Costello Publishing Co., Inc. v. John E. Rotelle, O. S. A., et al.,* No. 76–1930 (D.D.C. August 22, 1980), mem. op. at 4, J.A. 946.

9. The district court held:
 The Court concludes that the license agreement of January 23, 1976 is applicable to *Morning and Evening Prayer.* . . . Any alleged defects in plaintiff's book which gave rise to Intervenors' counterclaim are not sufficient to place the book beyond the contemplation of the January 23, 1976 license. Intervenors' argument that there exists no license governing plaintiff's book based upon the assertion that the book is functionally useless as a religious tool are unpersuasive, and are underminded by intervenors' allegations that Talbot breached numerous terms of the agreement. The term "derivative" was not defined in the license, and it is not disputed that plaintiff's book is a derivative within the ordinary meaning of the term. . . . The possibility that Talbot may have breached a material implied term of the license in

court apparently failed to recognize that breach of the licensing agreement might also constitute copyright infringement if the breach were material or if it resulted in a failure to satisfy a condition to the license.[10] Therefore, the district court should not have dismissed the counterclaims for failure to join an indispensable party before deciding if valid copyright infringement claims were, in fact, asserted, for it is well established that a suit for infringement is analogous to other tort actions and infringers are jointly and severally liable; hence plaintiff need sue only such participants as it sees fit.[11] This rule was recently endorsed by this court in *Stabilisierungsfonds Fur Wein, et al. v. Kaiser Stuhl Wine Distributors Pty. Ltd., et al.*, 647 F.2d 200 (D.C.Cir.1981) [hereinafter *German Wine*]. There Judge Ginsburg observed:

> Courts have long held in patent, trademark, literary property, and copyright infringement cases, any member of the distribution chain can be sued as an alleged joint tort-feasor. *See, e.g., Wells v. Universal Pictures Co.*, 166 F.2d 690, 692 (2d Cir. 1948); *Grocers Baking Co. v. Sigler*, 132 F.2d 498, 502 (6th Cir. 1942). Since joint tortfeasors are jointly and severally liable, the victim of trademark infringement may sue as many or as few of the alleged wrongdoers as he chooses; those left out of the lawsuit, commentary underscores, are not indispensable parties.[12]

■ This court's decision in *German Wine* overturned a decision of the district court that dismissed a trademark infringement claim against an Australian wine producer and its American distributors. The district court had decided that it lacked personal jurisdiction over the Australian defendants and for that reason held that the action could not proceed against the American defendants. In reversing, we held that the ·District of Columbia long-arm statute authorized adjudication of the claims against the Australian wine companies. Although not necessary to the decision, this court felt compelled to note that even if jurisdiction were lacking over the Australian defendants, the claims against the American defendants should not have been dismissed because any member of the distribution chain could be sued as an alleged joint tortfeasor. Under the same reasoning, in the instant case, the Episcopal Conferences can counterclaim copyright infringement against Costello without being required to join Talbot Press. The remedy requested—destruction of the accused books—is one that would be carried out only against Costello. J.A. 46.

■■ Costello seeks to distinguish *German Wine* by arguing that there "[t]he parties defending the action did not claim that the foreign companies had obtained a right to use the trademark from the parties claiming infringement. In contrast to the situation in [*German Wine*], the defendant distributor in this case, appellant Costello, has asserted that the copying activities that

---

that certain agreed upon specifications of the contemplated derivative were not complied with does not persuade this court that no license existed.

The counterclaim is thus reduced to actions based upon the construction of the January 23, 1976 licensing agreement, and it is well established that rules governing the construction and interpretation of contracts apply in the context of copyright licenses. . . . Courts have uniformly held that in actions construing the terms of a contract all parties thereto must be joined under Rule 19(a). . . .
Costello Publishing Co., Inc. v. John E. Rotelle, O. S. A., et al., No. 76–1930 (D.D.C. November 20, 1978), mem. op. at 2–3, J.A. 667–72.

**10.** *See* pp. 1045–1046 *infra*.

**11.** 3A Moore's Federal Practice ¶ 19.14[2–4] (2d Ed. 1974); 7 Wright & Miller, Federal Practice and Procedure, § 1614, pp. 155–56 (1972 ed.); 3 Nimmer on Copyright § 12.03 [12–32 n.18] (1980 ed.) [hereinafter Nimmer]. Lewis, *Mandatory Joinder of Parties in Civil Proceedings: The Case for Analytical Pragmatism*, 26 U.Fla.L.Rev. 381, 401 n.80 (1974) argues that "it would be inappropriate to change the traditional rule that views joinder of joint tortfeasors as permissible but not mandatory. If a plaintiff has no desire to litigate against a particular joint tortfeasor, then it would be champertous of the law to require joinder. . . . A defendant who might desire contribution against a co-joint tortfeasor can invoke the impleader procedure. . . ."

**12.** *German Wine, supra* at 207.

form the basis of the claim of copyright infringement were undertaken in compliance with the terms of a copyright license issued by the copyright holder to a foreign publisher." Appellant's Supplemental Brief at 5. Nevertheless, if Talbot Press failed to satisfy a condition to its license or materially breached the licensing agreement, it had no rights under which Costello can take cover and therefore both Talbot Press and Costello acted without authority and thereby infringed defendant-intervenors' copyright. *See* pp. 1045–1046 *infra.* Costello's good faith use of the material would not insulate Costello, for intent is not an element of infringement,[13] and the copyright holder may proceed against any member of the chain of distribution. *See* p. 1043 *supra.*

Costello maintains that *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir. 1976), is inapposite for similar reasons. That case was brought by a group of British writers and performers known as "Monty Python," who wrote and performed television programs broadcasted by the British Broadcasting Company ("BBC"), against the American Broadcasting Company ("ABC"). The BBC had a license for the programs, but the Monty Python group retained all rights in the script. The BBC could sublicense transmission of recordings of the program and did so to Time-Life, who broadcasted them through ABC. When the Monty Python group learned that ABC had edited portions of programs, it requested ABC not to edit further broadcasts. ABC refused to honor the request and the Monty Python group sought a preliminary injunction for infringement of copyright and unfair trade practices against ABC only. The district court denied relief, *inter alia,* because the Monty Python group failed to join the BBC and Time-Life as indispensable parties. The Second Circuit

reversed, holding that those at the end of the chain of distribution can acquire no greater rights than the licensee. *Id.* at 21. Costello seeks to distinguish *Gilliam* because there "it was the act of ABC . . . in editing the work that formed the basis of Monty Python's copyright infringement claim . . . . In the case at hand, Costello Publishing Company has done nothing to edit or change *Morning and Evening Prayer.*" However, if Talbot Press failed to satisfy a condition to the license, then the copyright holder can proceed against Costello for infringement of copyright even though Costello did not intend to participate in Talbot Press' alleged wrongdoing. *See* pp. 1042–1044 *supra.*

■ Costello also argues that the allegations concerning breach of the terms of the copyright license cannot be resolved without the participation of Talbot Press because that contract was formed by the Episcopal Conferences and Talbot Press. Costello argues further that it would be inequitable to force Costello to defend what is essentially a contract action when it was not a party to the contract. Stripped of the assumption that the counterclaims are merely contract actions, Costello is left only with the argument that Talbot Press is indispensable because Costello needs evidence from Talbot Press for a defense. But the question of whether or not an entity or individual should be a *party* to an action is something quite different from the questions and problems associated with obtaining evidence from such an entity or individual. Rule 19 of the Federal Rules of Civil Procedure[14] does not list the need to obtain evidence from an entity or individual as a factor bearing upon whether or not a party is necessary or indispensable to a just adjudication. Thus, we conclude that the district court erred in dismissing the counterclaims for failure to join Talbot Press as an

---

**13.** Intent is not an element of either copyright infringement, *Johns Printing Co. v. Paull-Pioneer Music Corp.,* 102 F.2d 282 (8th Cir. 1939); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,* 456 F.Supp. 531 (S.D.N.Y.1977), *aff'd,* 592 F.2d 651 (2d Cir. 1978), or unfair trade practices, *Parkway Baking Co. v. Freihofer*

*Baking Co.,* 255 F.2d 641 (3d Cir. 1958), though it would be relevant in formulating a remedy, since the remedy is equitable in nature. *Tempo Music, Inc. v. Myers,* 407 F.2d 503 (4th Cir. 1969).

**14.** *See* p. 1041 n.6 *supra.*

indispensable party before deciding whether a copyright infringement had taken place.

B. *Counterclaims on Remand*

On remand the district court must determine whether Talbot Press materially breached the licensing agreement or failed to satisfy a condition to the license. If Talbot Press' conduct merely constituted an immaterial breach of contract and, in addition, that breach was not a failure to satisfy a condition to the license,[15] then the Episcopal Conferences would only have a cause of action for breach of contract and Talbot Press would be an indispensable party. 3 Nimmer § 10.15 [10–108]. However, if Talbot Press failed to satisfy a condition to the license, any use by the licensee or its assignee would constitute an infringement of copyright[16] and defendant-intervenors could elect to pursue a remedy for infringement rather than breach of contract. 3 Nimmer § 10.15 [10–109 n.11]. In addition, even if the counterclaims asserted merely constitute a breach of contract, an action for copyright infringement would lie if the breach is so material that it allows the grantor power to recapture the rights granted so that any further use of the work was without authority. *Id.* at 10–110. It is established that even without an express reversion clause, the power to recapture may be exercised if a breach of contract is so material as to create a right of rescission in the grantor. *Nolan v. Sam Fox Publishing Co.*, 499 F.2d 1394 (2d Cir. 1974); *Nolan v. Williamson Music, Inc.*, 300 F.Supp. 1311 (S.D.N.Y.1969), *aff'd sub nom Nolan v. Sam Fox Publishing Co.*, 499 F.2d 1394 (2d Cir. 1974).

The license granted by the Episcopal Conferences to Talbot Press provided:

> The intention of the license herein granted to you is that you should thereby be authorized to produce and print an edition of a Breviary (hereinafter called the Derivative) particularly suited to the needs of the Dominican Order and to sell such copies to the Dominican Order in Ireland for them to supply to members of their own Order including tertiaries. You should not produce or print copies of the Derivative for any party other than the Dominican Order in Ireland and you should obtain an undertaking in writing from the Dominican Order that they will not supply copies to members of other religious orders or place copies on general sale at retail or wholesale outlets.

J.A. 177. It does not appear from the record that Talbot Press did in fact secure a written agreement from the Dominican Order stating that the Dominicans would not supply copies of the book to any other religious order or place copies on general sale. Indeed, there is evidence that copies of the book have been placed on general sale. In addition, it is unclear whether or not the substitution was authorized. Patrick McGoldrick, advisor to the Episcopal Conferences, read the galleys of the book in late August and reported that the edition fulfilled all requirements. J.A. 62. He noted that the book contained "no newly set material." *Id.* The composition was duplicated and substitutions were readily apparent according to Austin Flannery, manager of Dominican Publications. J.A. 185; *see also* J.A. at 165, 181. After consultation with McGoldrick, Archbishop Dermot Ryan of the Archdiocese of Dublin granted an imprimatur to *Morning and Evening Prayer.* Whether McGoldrick and Ryan were deceived, or were simply mistaken, is not clear. In any event, the factual issue as to whether the substitutions were authorized must be decided by the district court. Likewise, whether or not the agreement has been materially breached or whether the breach constitutes a failure to satisfy a condition and, if so, how the breach ought to be remedied are matters which we must leave to the district court. If it finds a material breach of contract or a failure to

---

**15.** By condition, we mean simply any fact or event which qualifies a duty to perform. *See generally* Corbin, *Conditions in the Law of Contract*, 28 Yale L.J. 739 (1919).

**16.** *See esp. Gilliam, supra*, 538 F.2d at 21; *see also National Bank of Commerce v. Shaklee Corp.*, 207 U.S.P.Q. 1005, 503 F.Supp. 533 (W.D.Tex.1980).

satisfy a condition to the license, and formulates a remedy that would deprive Costello of that which it seeks to protect by way of an antitrust action, the district court would not have to face the antitrust claims again. Otherwise, it must.

### C. The Antitrust Claims

The district court found that the actions of the defendant-intervenors were not motivated by commercially competitive concerns and held that their religiously motivated conduct fell beyond the realm of the antitrust laws. If the district court on remand finds that Costello did not infringe defendant-intervenors' copyright, it should not reinstate its decision on the antitrust issues because we cannot agree with the district court that the actions of defendant-intervenors are altogether exempt from antitrust scrutiny simply because their motives were religious.[17] To help advance resolution of this case, we offer the following guidelines to the district court.

### 1. Statutory Considerations

 To find a violation of the antitrust laws, the actions complained of here must first be shown to have an anticompetitive effect in the marketplace. *See* pp. 1046–1048 *infra*. Also, with respect to allegations of conspiracy and attempts to monopolize, specific intent must be shown. *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980); *Carpet Seaming Tape Licensing Corp. v. Best Seam, Inc.*, 616 F.2d 1133 (9th Cir. 1980); *International Railways of Central America v. United Brands*, 532 F.2d 231 (2d Cir.), *cert. denied*,

429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976). In addition to conspiracy and attempt, Costello has alleged concerted refusals to deal, boycott, restraints on competition, and allocation of markets in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and the Wilson Tariff Act, 15 U.S.C. § 8. It is now clear, however, that "easy labels do not always supply ready answers." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., et al.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). At any rate, the actions involved here do not fit neatly into any of the categories heretofore easily identified as antitrust violations. Although some actions, which resemble in certain respects those alleged here, have in the past been labeled *per se* violations of the antitrust laws, *see, e.g., United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (hereinafter *Schwinn*) (allocation of exclusive marketing territories held *per se* illegal under antitrust laws); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (group boycott labeled *per se* illegal), more recent cases suggest that the economic "realities" of the market and consumer welfare guide antitrust inquiry.[18]

The BCL does not operate on the same market level as the retail distributors; and the distributors do not operate on the same market level as Costello. The Church and the retailers, and the retailers and Costello share vertical relations. The retailers do not appear to have anything to gain by boycotting the accused book and it might be

---

**17.** The district court observed:

[Defendants'] actions had no commercially competitive motive, but were undertaken as an exercise of the duty each of the intervenor-defendants has to protect the integrity of Roman Catholic liturgy worldwide. Such religiously motivated conduct is not the type which falls within the realm of the antitrust laws. . . .

*Costello Publishing Co., Inc. v. John E. Rotelle, O. S. A., et al.*, No. 76–1930 (D.D.C. August 22, 1980), mem. op. at 4, J.A. 946.

**18.** *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (hereinafter *GTE Sylvania*)

(vertical market division not properly subject to *per se* rule; *Schwinn, supra*, overruled); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1177–91. (D.C.Cir. 1978) (rule of reason approach to group boycotts). *Compare Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (tying arrangement illegal *per se*), *with United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (although following the law of the case established in *Fortner I*, the Supreme Court suggested a new direction in such cases).

suggested that they are in the best position to mediate the market impact of the BCL's memorandum. The relationship between the BCL and the retailers, as far as it appears, may be less restrictive than exclusive franchise systems, which have been sanctioned by the Supreme Court.[19] However, Costello and defendant-intervenors are horizontally as well as vertically related and, for example, a case of predation may be successfully established. *See* Bork at 144–60. The American Church has a financial interest in the sale of ICEL translations, J.A. 1591, 1604–05, which may be undercut by sales of Costello's books. However, it is at least problematical whether a financial interest sufficient to suggest predation has yet been shown. Further, Memorandum 5,[20] sent by the BCL to various retailers, requesting that they not purchase the accused book for resale, did not explicitly threaten reprisals for rejecting the request, nor did it advocate a complete boycott of Costello's other merchandise.[21] It remains for the district court to find precisely what the practical effect of the memorandum on the retailers was.

In presenting its antitrust case so far, Costello has noted that the Catholic Church and the BCL have great market power. But it is unclear whether that power has been abused. Abuse has been suggested by pointing to reciprocal agreements between various conferences. J.A. 1573, 1575, 1580. But the conferences are themselves merely departments of a worldwide organization. The official Church "authorization," without which publishers may decide not to export their books, may be simply an endorsement, which publishers are free to solicit and which the BCL is free to award. Seen in that light, authorization has a value that is traded in consideration for the publication or distribution of books that meet a certain standard. If the value of Church authorization is outweighed by the cost of the restrictive standards, publishers and distributors are free to pursue their interest without the Church. Similarly, if the "price" the BCL extracts from retailers by requesting that unapproved books not be sold, exceeds the value of authorization, the retailers might refuse the request. Assuming that the Catholic Church had a financial interest in every approved book and asked religious goods retailers not to sell unapproved books, retailers might not be willing to pay the full monopoly price for the approved books *and* accept the restriction as well. The monopoly rent can be extracted only once. *See generally*, Bork at 107–33. If market power is completely represented by the cost of the product, further cost in the form of a restriction could not be imposed.[22]

---

**19.** *GTE Sylvania, supra. See also* P. Areeda, Antitrust Analysis 678–79 n.42, 681 n.45 (1981) (cases cited); *see generally*, R. Bork, The Antitrust Paradox: A Policy at War With Itself 280 -298 (1978) (hereinafter Bork).

**20.** Memorandum 5 reads in part:

Once again I have the unpleasant task of advising you that a publisher in the United States, Costello Publishing Company, has circulated a flyer with inaccurate and misleading information (see enclosed).

The Costello Publishing Company plans to distribute in the dioceses of the United States a book of Morning, Evening and Night Prayer which has not been approved for use in the dioceses of the United States by the National Conference of Catholic Bishops. They are importing this book from Ireland into this country without the authorization of the local hierarchy of that country and without the local authorization of the episcopal conference of this country.

We have kindly asked the publishing firm in question not to distribute this book, but they insist on going against the decisive vote of the episcopal conference.

Once again I ask your cooperation in this matter. Please do not distribute this book in the dioceses of the United States.

**21.** *Cf. Hester v. Martindale-Hubbell, Inc.*, 659 F.2d 433 (4th Cir. 1981) (summary judgment for defendants in restraint of trade case brought by attorney—whose request to advertise in Martindale-Hubbell was denied because he failed to meet a certain rating—against Martindale-Hubbell, the ABA, and the state bar association, affirmed).

**22.** If this case did not involve a religious publication and an organization affiliated with the Roman Catholic Church, the antitrust issues might seem easier. This case appears more complex because the market power enjoyed by the Church derives in large part from religious

Although, when given the opportunity to develop its antitrust case Costello may be able to demonstrate anti-competitive forces, the case has yet to be made. Since summary judgment was granted on grounds of a religious exemption, we are unable to say that the case cannot be made. On remand it is critical that the district court make complete findings on the nature of the communications between the Church and retail book distributors involved in this case. Such findings are essential to an ultimate assessment not only of whether an antitrust violation has taken place, but also of whether an antitrust exemption can be justified.

### 2. Constitutional Considerations

Defendant-intervenors have argued that any application of the antitrust laws to their actions with respect to Costello would deprive them of their First Amendment right to exercise freely their religion. They seek support for their argument from the *Noerr* Doctrine.[23] *Noerr* held that an attempt to secure passage of legislation that would injure competition was not subject to the antitrust laws. The Court's holding was based in part upon the "dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the [Sherman] Act." *Id.* 365 U.S. at 136, 81 S.Ct. at 529. The Court was also concerned with the constitutional difficulties revolving around the First Amendment guarantee of the right to petition that would be posed were such activity subjected to the antitrust laws.[24] Most recently the *Noerr* Doctrine has been applied in *State of Missouri v. National Organization For Women*[25] and *Allied International, Inc. v. International Longshoremen's Association, AFL–CIO*[26] to shield economic boycotts (which might normally come up against antitrust bans) when used as political tools to secure noncommercial goals. This case contains elements that are both akin to and different from *Noerr, NOW* or *ILA*. It involves the problem of whether and to what extent an exemption from the antitrust laws must be recognized for conduct engaged in by a religious organization in furtherance of religious goals, but which has (assuming an antitrust violation) injurious anticompetitive consequences.

Unlike *Noerr, NOW* and *ILA*, it is important to note that involved here is a concern of the First Amendment which is double-edged. While the political participatory rights guaranteed by the First Amendment all seek to further political activity ("Congress shall make no law . . . abridging the freedom of speech, or of the press; or of the right of the people to peaceably assemble, and to petition the Government for a redress of grievances."), the religious rights guaranteed seek to protect religious liberties, but prohibit state establishment of religion. ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .") But like *Noerr, NOW* and *ILA*, the present case does involve actions of concern to the First Amendment. The extent to which those actions are of such concern, however,

---

rather than economic factors. Nevertheless, setting an exchange rate between religious and economic factors is theoretically no more difficult than putting a price on advertising. *See* Bork at 314-20.

23. *Eastern Railroad Presidents Conference, et al. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (hereinafter *Noerr*).

24. *See also, California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (hereinafter *Trucking Unlimited*); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626

(1965); *Federal Prescription Service, Inc., et al. v. American Pharmaceutical Assoc.*, 663 F.2d 253, 261–262 (D.C.Cir.1981).

25. 620 F.2d 1301 (8th Cir.), *cert. denied*, 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980) (hereinafter *NOW*) (boycott to influence passage of the Equal Rights Amendment held not to fall within the scope of the antitrust laws).

26. 492 F.Supp. 334 (D.Mass.1980) (hereinafter *ILA*) (concerted refusal to load and unload ships engaged in trade with the U.S.S.R. because of the Soviet Union's invasion of Afghanistan found not violate the antitrust laws).

is not yet clear.[27] Likewise, the countervailing economic considerations depend upon the extent to which the concerns of the antitrust laws are implicated by the activity challenged.[28] Thus, there is a spectrum running between the core concerns of the two interests involved—religious freedom and competition. Resolution of those competing interests necessarily requires a delicate balancing.

The antitrust laws have in the past been employed against organizations that operate under the protection of the First Amendment. *See, e.g., Times-Picayune v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Lorain Journal v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). But they have not, to our knowledge, been applied against a religious organization. Nevertheless, while the freedom to believe is absolute, civil law has always been recognized to have some right to impose restrictions on the freedom to act in pursuit of religious beliefs.[29] Thus neither religious (free exercise) nor social (antitrust) interests are totally free from a "balancing process." *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (hereinafter *Yoder*); *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *cf. McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (relying upon the "delicate balancing" required by *Yoder,* the Supreme Court struck down a state law disqualifying clergy from being legislators). The district court's ruling that the conduct attacked here is exempted because it was motivated by religious concerns does not press the inquiry far enough. Although motivation is an important consideration, good motive cannot immunize any action taken in its behalf. Of course, the antitrust laws should be read to trench as little as possible upon First Amendment freedoms,[30] but we read neither the *Noerr* nor the *Yoder* line of cases as requiring an absolute exemption from the antitrust laws for economic pressure tactics, however predatory, that are religiously motivated.

We do not find any inconsistency between the *Noerr* line of cases and the *Yoder* balancing test. *Noerr* has been interpreted, first of all, not to apply to a situation where "First Amendment rights [are] used as the means or the pretext for achieving 'substantive evils' . . . which the legislature has the power to control." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972). Thus the district court must initially determine if the economic pressure brought by the Church is legitimately geared to the Church's protection of its liturgy rather than its survival in the marketplace of religious books. That may be a more complicated quest here than that undertaken in *NOW* or *ILA,* where no potential economic benefits would have adhered to the perpetrators of the boycott from the success of their tactics. But even assuming that the Church's activity is a genuine expression of the right to exercise freely, there are still limits on the tactics

---

**27.** *Compare Trucking Unlimited, supra,* 404 U.S. at 511–15, 92 S.Ct. at 612–14 *with Noerr, supra.*

**28.** *See NOW, supra,* at 1312 ("A social piece of legislation and the efforts involved in influencing the legislature's actions on such legislation is further afield from the central focus of the Sherman Act than a commercial piece of legislation and the petitioning efforts associated therewith.").

**29.** *Cantwell v. Connecticut,* 310 U.S. 296, 303–304, 60 S.Ct. 900, 903–904, 84 L.Ed. 1213 (1940) ("the [free exercise clause of the First] Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society."); *see also Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244 (1879) (polygamy held illegal—"Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order.").

**30.** *Noerr, supra,* 365 U.S. at 138, 81 S.Ct. at 530; *Yoder, supra,* 406 U.S. at 215, 92 S.Ct. at 1533 ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").

that may be used to accomplish its ends, which limits must be determined by weighing the costs to the national antitrust policies against the needs of free religious exercise in this situation. *Noerr* dealt with a means—a publicity campaign, readily identifiable and commonly acceptable as a tactic to influence legislation; *NOW* and *ILA* dealt with boycotts—a staple of political, as well as economic, activity. But this does not mean that all tactics in furtherance of recognized political ends are exempt from the antitrust laws; it does not take much imagination to conceive of many that clearly are not. Thus we believe that in every case, the court must carefully assess the nature and extent of the antitrust violations, including their market impact, against the religious goal sought to be implemented before deciding that the activities are exempt. This is our understanding of what the *Noerr* and *NOW* courts did before concluding that the activities concerned there should be exempt from the antitrust laws.

There is no doubt that the actions of defendants here had an effect in the secular as well as in the Catholic community. But from the record before us, we are unable to strike the "delicate balance" between the First Amendment need to protect the free exercise of religion and the general community's interest in conducting commerce free of anti-competitive arrangements. If the balancing must be done at all, it is best left to the district court.

We delude ourselves neither that such balancing will be easy, nor that weighing the antitrust costs against the religious benefits of concerted activities might not at some point run afoul of the ban against state entanglement in religious affairs.[31] Therefore, the difficult constitutional question should be deferred by the district court until the copyright and, if necessary, the antitrust questions are resolved.

## CONCLUSION

For the foregoing reasons, the case is *remanded* so that the issues presented by defendant-intervenors' counterclaims can be addressed. If those counterclaims are resolved in favor of Costello, or if the relief awarded defendant-intervenors does not deprive Costello of the accused books, then the antitrust issues should be considered in light of the guidelines laid down in this opinion.[32]

*Reversed and remanded for proceedings in accordance with this opinion.*

---

**31.** *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *see also Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). The district court expressed its concern that any antitrust scrutiny would entangle it in ecclesiastical decisions. *Costello Publishing Co., Inc. v. John E. Rotelle, O. S. A., et al.*, No. 76–1930 (D.D.C. August 22, 1980), mem. op. at 5, J.A. 947. It is not yet clear, however, whether or to what degree that is necessarily true. Certainly the court must be cautious not to entangle itself in the decision-making process of the Church with regard to its religious obligations, but that concern should not block the court from at least considering the market impact of the activity in the first place in order to assess its antitrust effects. Further, if antitrust violations should be found, the court must, of course, be sensitive to the nature of the religious organizations involved in prescribing any antitrust remedies that might be warranted as well as in weighing competing First Amendment and antitrust interests.

**32.** In a Petition For Rehearing Or, In the Alternative, For Clarification filed by appellant on November 24, 1981, and denied on December 16, 1981, appellant Costello argues that all of his antitrust claims are not contingent upon successfully defending against the copyright counterclaim. While the focus of his antitrust arguments on appeal decidedly concerned the events surrounding the accused books, we agree that as to any alleged antitrust violations that go *beyond* those specific to Memorandum 5 and the accused books, a finding of infringement of copyright against Costello would not necessarily cut off access to antitrust remedies since such violations, if proven, might inflict injuries upon Costello over and above those involved in the loss of the books. *See* p. 1042 n.7 *supra*.